## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DENNIS PALKON, Individually and On Behalf of All Others Similarly Situated, | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | JURY TRIAL DEMANDED |
| CAESARS ENTERTAINMENT CORPORATION, JAMES HUNT, ANTHONY RODIO, THOMAS BENNINGER, JULIANA L. CHUGG, DENISE CLARK, KEITH COZZA, JOHN DIONNE, DON KORNSTEIN, COURTNEY MATHER, JAMES L. NELSON, RICHARD SCHIFTER, ELDORADO RESORTS, INC., and COLT MERGER SUB, INC., | ) ) ) ) ) ) ) ) ) ) ) ) | CLASS ACTION |
| Defendants. | ) | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action stems from a proposed transaction announced on June 24, 2019 (the "Proposed Transaction"), pursuant to which Caesars Entertainment Corporation ("Caesars" or the "Company") will be acquired by Eldorado Resorts, Inc. ("Parent") and Colt Merger Sub, Inc. ("Merger Sub," and collectively with Parent, "Eldorado").

2.      On June 24, 2019, Caesars' Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Eldorado.  Pursuant to the terms of the Merger Agreement, Caesars' stockholders will receive $8.40 in cash and 0.0899 shares of Parent stock for each share of Caesars

common stock they own.

3.      On September 3, 2019, defendants filed a Form S-4 Registration Statement (the "Registration Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.      The Registration Statement omits material information with respect to the Proposed Transaction, which renders the Registration Statement false and misleading.  Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Registration Statement.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Caesars common stock.

9.      Defendant Caesars is a Delaware corporation and maintains its principal executive offices at One Caesars Palace Drive, Las Vegas, Nevada 89109.  Caesars' common stock is traded

on the NasdaqGS under the ticker symbol "CZR."

10.     Defendant James Hunt is Chairman of the Board of the Company.

11.     Defendant Anthony Rodio is Chief Executive Officer and a director of the Company.

12.     Defendant Thomas Benninger is a director of the Company.

13.     Defendant Juliana L. Chugg is a director of the Company.

14.     Defendant Denise Clark is a director of the Company.

15.     Defendant Keith Cozza is a director of the Company.

16.     Defendant John Dionne is a director of the Company.

17.     Defendant Don Kornstein is a director of the Company.

18.     Defendant Courtney Mather is a director of the Company.

19.     Defendant James L. Nelson is a director of the Company.

20.     Defendant Richard Schifter is a director of the Company.

21.     The defendants identified in paragraphs 10 through 20 are collectively referred to herein as the "Individual Defendants."

22.     Defendant Parent is a Nevada corporation and a party to the Merger Agreement.

23.     Defendant Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Caesars (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

25.     This action is properly maintainable as a class action.

26.     The Class is so numerous that joinder of all members is impracticable.  As of June 24, 2019, there were approximately 682,161,838 shares of Caesars common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

27.     Questions of law and fact are common to the Class, including, among others, whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

28.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

29.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

30.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company and the Proposed Transaction*

31.     Caesars is the world's most geographically diversified casino-entertainment company.

4

32.    The Company began in Reno, Nevada in 1937 and has since grown through development of new resorts, expansions and acquisitions, and now operates casinos on three continents.

33.    The Company's resorts operate primarily under the Harrah's®, Caesars®, and Horseshoe® brand names.  The Company also owns the London Clubs International family of casinos.

34.    The Company currently owns and operates thirty-four casinos and resorts in Kentucky, Illinois, Indiana, Iowa, Louisiana, Mississippi, Missouri, Nevada, and New Jersey. Domestically, Caesars properties feature approximately 48,000 slot machines and VLTs, approximately 3,000 table games, and over 39,000 hotel rooms.

35.    On June 24, 2019, Caesars' Board caused the Company to enter into the Merger Agreement with Eldorado.

36.    Pursuant to the terms of the Merger Agreement, Caesars' stockholders will receive $8.40 in cash and 0.0899 of a share of Parent stock for each share of Caesars common stock they own.

37.    According to the press release announcing the Proposed Transaction:

Eldorado Resorts, Inc. (NASDAQ: ERI) ("Eldorado," "ERI," or "the Company") and Caesars Entertainment Corporation (NASDAQ: CZR) ("Caesars") announced that they have entered into a definitive merger agreement to create the largest U.S. gaming company. The proposed transaction will combine two leading gaming companies with complementary national operating platforms, strong brands, strategic industry alliances, and a collective commitment to enhancing guest service and shareholder value. The combined company will provide its guests with access to approximately 60 domestic casino–resorts and gaming facilities across 16 states. The transaction is transformational for each company's shareholders, employees and customers, combining Eldorado's operational expertise with Caesars industry-leading loyalty program, regional network and Las Vegas assets.

Summary of Caesars Transaction

Eldorado will acquire all of the outstanding shares of Caesars for a total value of $12.75 per share, consisting of $8.40 per share in cash consideration and 0.0899 shares of Eldorado common stock for each Caesars share of common stock based on Eldorado's 30- calendar day volume weighted average price per share as of May 23, 2019, reflecting total consideration of approximately $17.3 billion, comprised of $7.2 billion in cash, approximately 77 million Eldorado common shares and the assumption of Caesars outstanding net debt (excluding face value of the existing convertible note). Caesars shareholders will be offered a consideration election mechanism that is subject to proration pursuant to the definitive merger agreement. Giving effect to the transaction, Eldorado and Caesars shareholders will hold approximately 51% and 49% of the combined company's outstanding shares, respectively.

Upon completion of the transaction the combined company will retain the Caesars name to capitalize on the value of the iconic global brand and its legacy of leadership in the global gaming industry. The new company will continue to trade on the Nasdaq Global Select Market. . . .

Governance and Timing

The combined company's Board of Directors will consist of 11 members, six of whom will come from Eldorado's Board of Directors and five of whom will come from Caesars Board of Directors

The transactions have been unanimously approved by the Boards of Directors of Eldorado, Caesars and VICI. The Caesars transaction is subject to approval of the stockholders of Eldorado and Caesars, the approval of applicable gaming authorities, the expiration of the applicable Hart-Scott-Rodino waiting period and other customary closing conditions, and is expected to be consummated in the first half of 2020.

Advisors

J.P. Morgan, Credit Suisse and Macquarie Capital are serving as financial advisors to Eldorado. Milbank LLP and Latham & Watkins LLP are serving as Eldorado's legal counsel. PJT Partners LP is serving as financial advisor to Caesars. Skadden, Arps, Slate, Meagher & Flom LLP is serving as Caesars legal counsel.

38.     The Merger Agreement contains a "no solicitation" provision that prohibits the

Individual Defendants from soliciting alternative proposals and severely constrains their ability to

communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 5.3(a) of the Merger Agreement provides:

> Except as expressly permitted by this Section 5.3, the Company, on the one hand, and Parent, on the other hand, shall, and each shall cause its Subsidiaries and their respective directors, officers and employees to, and shall use its reasonable best efforts to cause its and its Subsidiaries' other Representatives and Affiliates to, (i) immediately cease any solicitation, knowing encouragement, discussions or negotiations with any Person that may be ongoing with respect to a Takeover Proposal, and promptly instruct (to the extent it has contractual authority to do so and has not already done so prior to the date of this Agreement) or otherwise request, any Person that has executed a confidentiality or non-disclosure agreement within the twelve (12)-month period prior to the date of this Agreement in connection with any actual or potential Takeover Proposal to return or destroy all such confidential information or documents previously furnished in connection therewith or material incorporating any such information in the possession of such Person or its Representatives (and to confirm in writing the return or destruction of all such information) and (ii) from and after the date of this Agreement until the Effective Time or, if earlier, the Termination Date, not, directly or indirectly, (A) solicit, initiate or knowingly facilitate or knowingly encourage any inquiries regarding, or the making of any proposal or offer that constitutes, or would reasonably be expected to lead to, a Takeover Proposal, (B) engage in, continue or otherwise participate in any substantive discussions or negotiations regarding, or furnish to any other Person any non-public information in connection with or for the purpose of encouraging or facilitating, a Takeover Proposal (other than (x) solely in response to an unsolicited inquiry, to refer the inquiring Person to this Section 5.3(a) or (y) upon receipt of a *bona fide*, unsolicited written Takeover Proposal from any Person that did not result from a breach of this Section 5.3(a), solely to the extent necessary to ascertain facts or clarify terms with respect to a Takeover Proposal for the Company Board of Directors or the Parent Board of Directors, as applicable, to be able to have sufficient information to make the determination described in Section 5.3(b)) or (C) approve, recommend or enter into, or propose to approve, recommend or enter into, any letter of intent or similar document, agreement, commitment or agreement in principle providing for a Takeover Proposal.

39.     Additionally, the Company must promptly advise Eldorado of any proposals or inquiries received from other parties.  Section 5.3(d) of the Merger Agreement states:

> Each of the Company and Parent shall promptly (and in no event later than forty-eight (48) hours after receipt) notify, orally and in writing, one another of any Takeover Proposal received by such Party or any of its Representatives, which notice shall include the identity of the Person making the Takeover Proposal and the material terms and conditions thereof (including copies of any written proposal

relating thereto provided to such Party or any of its Representatives) and indicate whether such Party has furnished non-public information to, or entered into discussions or negotiations with, such third party. Each of the Company and Parent shall keep one another reasonably informed on a reasonably current basis as to the status of (including changes to any material terms of, and any other material developments with respect to) such Takeover Proposal. Each of the Company and Parent agrees that it and its Subsidiaries will not enter into any Contract with any Person subsequent to the date of this Agreement that prohibits such Party from providing any information to Parent in accordance with this Section 5.3.

40.     Moreover, the Merger Agreement contains a restrictive "fiduciary out" provision permitting the Board to change its recommendation of the Proposed Transaction under extremely limited circumstances, and grants Eldorado a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 5.3(e) of the Merger Agreement provides:

> Except as expressly permitted by this Section 5.3(e), the Company Board of Directors and the Parent Board of Directors shall not (i) (A) fail to include the Company Recommendation (in the case of the Company Board of Directors) or the Parent Recommendation (in the case of the Parent Board of Directors) in the Joint Proxy Statement/Prospectus, (B) change, qualify, withhold, withdraw or modify, or authorize or publicly propose to change, qualify, withhold, withdraw or modify, in a manner adverse to Parent, the Company Recommendation (in the case of the Company Board of Directors) or to the Company, the Parent Recommendation (in the case of the Parent Board of Directors), (C) make or publicly propose to make any recommendation in connection with a tender offer or exchange offer other than a recommendation against such offer or a customary "stop, look and listen" communication by the Company Board of Directors or the Parent Board of Directors, as applicable, of the type contemplated by Rule 14d-9(f) under the Exchange Act (it being understood that the Company Board of Directors or the Parent Board of Directors, as applicable, may refrain from taking a position with respect to such a tender offer or exchange offer until the close of business as of the tenth (10th) Business Day after the commencement of such tender offer or exchange offer pursuant to Rule 14d-9(f) under the Exchange Act without such action being considered an Adverse Recommendation Change so long as the Company reaffirms the Company Recommendation or Parent reaffirms the Parent Recommendation during such period), (D) other than with respect to the period of up to ten (10) Business Days applicable to formal tender or exchange offers that are the subject of the preceding clause (C), fail to recommend against a Takeover Proposal or fail to reaffirm the Company Recommendation or the Parent Recommendation, as applicable, in either case within ten (10) Business Days after a request by Parent or the Company, as applicable, to do so; provided, however, that (1) such ten (10) Business Day period shall be extended for an additional ten (10) Business Days following any material modification to any Takeover Proposal

occurring after the receipt of Parent's or the Company's written request, as applicable, and (2) each of Parent and the Company shall be entitled to make such a written request for reaffirmation only once for each Takeover Proposal and once for each material amendment to such Takeover Proposal (any action described in this clause (i) being referred to as an "Adverse Recommendation Change"); or (ii) authorize, cause or permit the Company or any of its Subsidiaries (in the case of the Company Board of Directors) or Parent or any of its Subsidiaries (in the case of the Parent Board of Directors) to enter into any letter of intent, agreement, commitment or agreement in principle providing for any Takeover Proposal (other than an Acceptable Confidentiality Agreement entered into in accordance with Section 5.3(c)). Notwithstanding anything to the contrary set forth in this Agreement, prior to the time the Company Stockholder Approval or the Parent Stockholder Approval is obtained, (x) the Company Board of Directors or the Parent Board of Directors, as applicable, may make an Adverse Recommendation Change if (1) the Company or Parent, as applicable, is not in material breach of this Section 5.3 and (2) after receiving a bona fide unsolicited written Takeover Proposal, the Company Board of Directors or the Parent Board of Directors, as applicable, has determined in good faith, after consultation with its outside financial advisors and outside legal counsel, that (i) such Takeover Proposal constitutes a Superior Proposal and (ii) in light of such Takeover Proposal, the failure to take such action would be reasonably likely to be inconsistent with the Company Board of Directors' or the Parent Board of Directors' fiduciary duties under applicable Law and (y) the Company may terminate this Agreement in order to enter into a binding written agreement with respect to a Superior Proposal in accordance with Section 7.1(k); provided, that the Company Board of Directors or the Parent Board of Directors, as applicable, has determined in good faith, after consultation with its outside financial advisors and outside legal counsel, that failure to take such action would be reasonably likely to be inconsistent with the Company Board of Directors' or the Parent Board of Directors' fiduciary duties under applicable Law; provided, however, that, prior to making any Adverse Recommendation Change or terminating this Agreement as described in clauses (x) and (y) of this sentence, (A) the Company has given Parent, or Parent has given the Company, as applicable, at least four (4) Business Days' prior written notice of its intention to take such action (which notice shall specify the material terms and conditions of any such Superior Proposal) and the Company has contemporaneously provided to Parent, or Parent has contemporaneously provided to the Company, as applicable, a copy of the Superior Proposal and a copy of any written proposed transaction documents with the person making such Superior Proposal, (B) the Company has negotiated in good faith with Parent, or Parent has negotiated in good faith with the Company, during such notice period to enable Parent or the Company, as applicable, to propose revisions to the terms of this Agreement such that it would cause such Superior Proposal to no longer constitute a Superior Proposal, (C) following the end of such notice period, the Company Board of Directors or the Parent Board of Directors, as applicable, shall have considered in good faith any revisions to the terms of this Agreement proposed in writing by Parent (in the case of the Company Board of Directors) or the Company (in the case of the Parent Board of Directors), and shall

have determined, after consultation with its outside financial advisors and outside legal counsel, that the Superior Proposal continues to constitute a Superior Proposal if the revisions proposed by Parent or the Company, as applicable, were to be given effect, and (D) in the event of any change to any material terms of such Superior Proposal, the Company shall have delivered to Parent, or Parent shall have delivered to the Company, as applicable, an additional notice consistent with that described in clause (A) above of this proviso and a new notice period under clause (A) of this proviso shall commence (except that the four (4) Business Day period notice period referred to in clause (A) above of this proviso shall instead be equal to the longer of (i) two (2) Business Days and (ii) the period remaining under the notice period under clause (A) of this proviso immediately prior to the delivery of such additional notice under this clause (D)) during which time the Company shall be required to comply with the requirements of this Section 5.3(e) anew with respect to such additional notice, including clauses (A) through (D) above of this proviso.

41.     The Merger Agreement also provides for a "termination fee" of $418,407,185 payable by the Company to Eldorado if the Individual Defendants cause the Company to terminate the Merger Agreement.

***The Registration Statement Omits Material Information***

42.     Defendants filed the Registration Statement with the SEC in connection with the Proposed Transaction.

43.     As set forth below, the Registration Statement omits material information with respect to the Proposed Transaction.

44.     First, the Registration Statement omits material information regarding the Company's and Eldorado's financial projections.

45.     With respect to the Company's financial projections, the Registration Statement fails to disclose, for each set of projections: (i) all line items used to calculate (a) EBITDAR, (b) EBITDA, and (c) unlevered free cash flow; and (ii) a reconciliation of all non-GAAP to GAAP metrics.

46.     With respect to Eldorado's financial projections, the Registration Statement fails to disclose, for each set of projections: (i) all line items used to calculate (a) EBITDAR, (b) EBITDA, and (c) unlevered free cash flow; and (ii) a reconciliation of all non-GAAP to GAAP metrics.

47.     The disclosure of projected financial information is material because it provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion.

48.     Second, the Registration Statement omits material information regarding the analyses performed by the Company's financial advisor in connection with the Proposed Transaction, PJT Partners LP ("PJT").

49.     With respect to PJT's *Selected Precedent Transaction Analysis*, the Registration Statement fails to disclose: (i) the transactions observed by PJT in the analysis; and (ii) the individual multiples and metrics for the transactions.

50.     With respect to PJT's *Discounted Equity Value Analysis*, the Registration Statement fails to disclose: (i) the terminal values of Caesars; (ii) PJT's basis for applying a range of terminal value to estimated EBITDA multiples of 8.25x to 9.25x; (iii) estimated net debt and minority interests; (iv) Caesars' equity ownership in the Baltimore joint venture; (v) the fully diluted number of shares of Caesars common stock; and (vi) the individual inputs and assumptions underlying the discount rate of 13.50%.

51.     With respect to PJT's *Discounted Cash Flow Analysis*, the Registration Statement fails to disclose: (i) all line items used to calculate unlevered free cash flows; (ii) the ranges of terminal values of Caesars; (iii) PJT's basis for applying the exit multiple range of 8.25x to 9.25x; (iv) the individual inputs and assumptions underlying the discount rates ranging from 8.75% to

9.25%; (v) net debt and minority interests; (vi) the value of Caesars' equity ownership in the Baltimore joint venture; and (vii) the fully diluted number of shares of Caesars common stock.

52.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

53.     Third, the Registration Statement omits material information regarding potential conflicts of interest of PJT.

54.     The Registration Statement fails to disclose the estimated amount of the "discretionary fee [that] may be payable to PJT Partners upon the closing of the Merger," as well as the circumstances under which such fee is payable and whether defendants intend to pay PJT the fee.

55.     The Registration Statement fails to disclose the amount of compensation PJT received for the past services it provided to the Company and its affiliates.

56.     Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

57.     Fourth, the Registration Statement fails to disclose whether the Company entered into any confidentiality agreements that contained "don't ask, don't waive" provisions that are or were preventing the counterparties from requesting waivers of standstill provisions to submit superior offers to acquire the Company.

58.     Without this information, stockholders may have the mistaken belief that, if these potentially interested parties wished to come forward with a superior offer, they are or were permitted to do so, when in fact they are or were contractually prohibited from doing so.

59.     The omission of the above-referenced material information renders the Registration Statement false and misleading, including, *inter alia*, the following sections of the Registration Statement: (i) Background of the Merger; (ii) Caesars Board's Reasons for the Merger and Recommendation of the Caesars Board; (iii) Opinion of Caesars' Financial Advisor; and (iv) Certain ERI and Caesars Financial Projections.

60.     The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Caesars**

61.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

62.     The Individual Defendants disseminated the false and misleading Registration Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. Caesars is liable as the issuer of these statements.

63.     The Registration Statement was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Registration Statement.

64.     The Individual Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

65.     The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder will consider them important in deciding how to vote

on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Registration Statement and in other information reasonably available to stockholders.

66.     The Registration Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

67.     By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

68.     Because of the false and misleading statements in the Registration Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Eldorado

69.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

70.     The Individual Defendants and Eldorado acted as controlling persons of Caesars within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or Board members of Caesars and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

71.     Each of the Individual Defendants and Eldorado was provided with or had unlimited access to copies of the Registration Statement alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

14

72.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.   The Registration Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction.   They were thus directly involved in the making of the Registration Statement.

73.     Eldorado also had supervisory control over the composition of the Registration Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Registration Statement.

74.     By virtue of the foregoing, the Individual Defendants and Eldorado violated Section 20(a) of the 1934 Act.

75.     As set forth above, the Individual Defendants and Eldorado had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.   As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.      Directing the Individual Defendants to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.      Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.      Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby requests a trial by jury on all issues so triable.

Dated: September 9, 2019

**OF COUNSEL:**

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile: (484) 631-1305
Email: rm@maniskas.com

**RIGRODSKY & LONG, P.A.**

By:    */s/ Gina M. Serra*
        Brian D. Long (#4347)
        Gina M. Serra (#5387)
        300 Delaware Avenue, Suite 1220
        Wilmington, DE 19801
        Telephone: (302) 295-5310
        Facsimile: (302) 654-7530
        Email: bdl@rl-legal.com
        Email: gms@rl-legal.com

        *Attorneys for Plaintiff*